**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

HOME DEPOT U.S.A., INC.,

     **PLAINTIFF,**

  **v.**

SEA STAR LINE, LLC,  SALTCHUK RESOURCES, INC., TOTEM OCEAN TRAILER EXPRESS, INC., AND LEONARD SHAPIRO,

     **DEFENDANTS.**

**Case No.**  2:12-cv-1045-CWH

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Home Depot U.S.A., Inc., by and through its undersigned counsel, alleges as follows:

1.      Plaintiff was a purchaser of Puerto Rican Cabotage shipping services who was injured as a result of Defendants' participation in an unlawful conspiracy to fix prices, fees and surcharges, rig bids, and allocate customers in the Puerto Rican Cabotage market beginning at least as early as May 2002 and continuing until at least April 2008.

2.      "Puerto Rican Cabotage" means coastal water freight transportation services between the United States and the Commonwealth of Puerto Rico ("Puerto Rico").

3.      As alleged herein, thus far, an investigation of the conspiracy in the Puerto Rican Cabotage market by the U.S. Department of Justice has yielded guilty pleas by two Puerto Rican Cabotage carriers (Sea Star Line and Horizon Lines) and four individual employees of those carriers (Baci, Gill, Glova, and Serra) for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  A fifth individual (Chisholm) pleaded guilty to obstruction of justice regarding his attempt to conceal the existence of the conspiracy by destroying documents and other records implicating the conspirators.

4.      The investigation by the U.S. Department of Justice is ongoing.  On November 17, 2011, the Department of Justice announced that Defendant Sea Star agreed to plead guilty and that its indictment of Sea Star and its former officer Frank Peake "arose from an ongoing federal investigation into price fixing, bid rigging, and other anticompetitive conduct in the coast water freight transportation industry."  On information and belief, additional indictments are forthcoming.

**Jurisdiction and Venue**

5.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and for permanent injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiff arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15(c) and 26.

7.      This Court has personal jurisdiction over each Defendants because each Defendant transacted business in this District and elsewhere, had substantial contacts in this District and elsewhere, resided in this District, and/or engaged in an unlawful conspiracy that was directed at and had the intended effect of causing injury to persons residing in or doing business in this District and elsewhere.

8.      Defendants and their co-conspirators marketed and sold substantial quantities of Puerto Rican Cabotage in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States and Puerto Rico.  Therefore, the activities of the Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

9.      Venue is proper in this District pursuant to 15 U.S.C § 22 and 28 U.S.C. § 1391(b) and (c), because Defendants resided, transacted business, were found, or had agents in this District, because Plaintiff operates retail stores in this District, and/or because one or more conspiratorial acts were conducted in this District, as alleged herein.

**Plaintiff**

10.     Plaintiff Home Depot U.S.A., Inc. ("Home Depot") is a Delaware

corporation with its principal place of business in Atlanta, Georgia.  Home Depot

operates over 2,200 retail stores, including eight stores in Puerto Rico, selling building

and home improvement products.  During the relevant time, Home Depot purchased

Puerto Rican Cabotage services directly from the conspirators, including the Defendant

Sea Star.  As a result of the conspiracy, Plaintiff was injured in its business or property by

reason of the antitrust violations pleaded.  From time to time, Plaintiff used a third-party

consolidation and logistics provider known as Red Oak Industries, Inc. ("Red Oak") to

facilitate and coordinate its purchases of Puerto Rican Cabotage services from Defendant

Sea Star and/or its co-conspirators.  Plaintiff contends that it was the direct purchaser of

such services.  Regardless, in April 2009, prior to the class exclusion deadline in the class

action case, *In Re: Puerto Rican Cabotage Antitrust Litigation*, Master Docket No. 08-

md-1960 (D.P.R.) (the "Class Action Case"), Red Oak assigned any and all of its claims

it may have had related to Home Depot shipping in the litigation to Home Depot, and

Red Oak did not submit claims in the Class Action Case related to Home Depot shipping.

Home Depot timely excluded itself and its assigned claims from the Class Action Case

and provided notice to the Court and the parties of this exclusion.  Because Home Depot

had the right to exclude its own and its assigned claims from the Class Action Case and

pursue those claims in any appropriate forum, there is no danger of multiplicative

litigation.  Accordingly, Home Depot brings this action regarding its own direct

purchases of Puerto Rican Cabotage and its assigned claims regarding the same.

### Defendants and Their Co-Conspirators

11.     Defendant Sea Star Line, LLC ("Sea Star") is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.  Sea Star is privately owned and managed by TOTE Inc. (f/k/a American Shipping Group, Inc., which is wholly-owned by Saltchuk Resources, Inc.) and Taino Star, Inc.  Prior to 2005, Saltchuk Resources, Inc. directly owned and controlled Sea Star.  Sea Star provides integrated transportation services to and from the United States and Puerto Rico.  Sea Star accounts for approximately 21 percent of the Puerto Rican Cabotage market.  Sea Star marketed and sold Puerto Rican Cabotage in the United States and this District from at least as early as May 2002 and continuing until at least as late as April 2008.

12.     Beginning July 2003, Frank Peake ("Peake") was the Chief Operating Officer, and subsequently President, of Sea Star.  Peake was responsible for determining Sea Star's pricing for Puerto Rican Cabotage.  Prior to July 2003, Peake was the Vice President and General Manager of the Alaska Division of CSX Lines, which later became Horizon, as defined herein.  Peake participated in the conspiracy at Sea Star and engaged in direct communications and agreements with competitors at CSX/Horizon and Crowley.

13.     As alleged herein, Peake was indicted by the U.S. Department of Justice for participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

14.     Peter Baci ("Baci") is an individual residing in Jacksonville, Florida.  During the relevant period, Baci was the Senior Vice President of Yield Management for Sea Star and was responsible for determining Sea Star's pricing for Puerto Rican

Cabotage.  Before joining Sea Star, Baci had been a long-time Crowley employee.  Baci participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

15.    As alleged herein, Baci was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

16.    Alexander G. Chisholm ("Chisholm") is an individual residing in Jacksonville, Florida.  During the relevant period, Chisholm was the Assistant Vice President of Yield Management for Sea Star.  Prior to working for Sea Star, Chisholm worked for Crowley Maritime, where he first met co-conspirator Thomas Farmer.

17.    As alleged herein, Chisholm was indicted by the U.S. Department of Justice and pleaded guilty to obstruction of justice for attempting to destroy documents and other information related to the conspiracy.

18.    Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington.  Saltchuk, which was incorporated in 1982, is a privately held holding company with approximately sixteen predominately maritime businesses, including Defendants Sea Star and TOTE.  Upon information and belief, Saltchuk directly participated in the conspiracy through its officers, directors, and/or agents, including Leonard Shapiro, Robert Magee, and Mark Tabbutt.

19.     Upon information and belief, Saltchuk exercised extensive and pervasive control over Sea Star, siphoned funds from Sea Star, commingled its accounts with Sea Star, and otherwise disregarded the corporate form and independence of Sea Star.

20.     Defendant Totem Ocean Trailer Express, Inc. ("TOTE") is a privately owned Washington corporation with its principal place of business in Federal Way, Washington.  TOTE is owned by Saltchuk and is an affiliate of Sea Star.  TOTE operates shipping services between Washington and Alaska, but it participated in the conspiracy regarding Puerto Rican Cabotage through its officers and agents, including Leonard Shapiro and Robert Magee, who served as Chairman, President, CEO and Director of TOTE.

21.     Defendant Leonard Shapiro ("Shapiro"), upon information and belief, resides on Mercer Island, Washington.  Shapiro was a founder and was a partner in Saltchuk during the conspiracy period.  Shapiro is also the Vice President of Pricing for TOTE, another Saltchuk subsidiary.  Although Shapiro was not a Sea Star employee, on information and belief, Shapiro instigated, participated in, and directed the conspiracy involving Puerto Rican Cabotage and Sea Star on behalf of Saltchuk and TOTE; he exercised control over Sea Star officers and directors, including Peter Baci; and he reached unlawful agreements with Horizon concerning the Puerto Rican Cabotage market.

22.     Crowley Maritime Corporation ("Crowley Maritime") is a privately owned Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida.

23.    Crowley Liner Services, Inc. ("Crowley Liner") is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida.  Crowley Liner is a wholly-owned subsidiary of Crowley Maritime.  Crowley Liner has operated a fleet of 35 vessels and provides scheduled marine transportation services between the continental United States and ports in the Caribbean and Central America, including ports in Puerto Rico.  Crowley Liner has operated at least nine large, multi-deck "rolls-on/rolls-off" ("ro/to") barges that ship goods to and from Puerto Rico.

24.    Crowley Maritime and Crowley Liner are hereafter collectively referred to, in this Complaint, as "Crowley."  Crowley has been in the business of liner services, logistics, energy support, project management, ocean towing and transportation, petroleum and chemical transportation, fuel sales and distribution, ship assist and escort, salvage and emergency response, vessel construction and naval architecture, and ship management.  Crowley accounts for approximately 31 percent of the Puerto Rican Cabotage market and uses tugs and barges to provide its services in this market.  Crowley marketed and sold cabotage in the United States and in this District from at least as early as May 2002 and continuing until at least April 2008.

25.    During the conspiracy period, Thomas Farmer ("Farmer") served as Vice President and General Manager, Sales & Marketing for Crowley's Puerto Rican Cabotage business.  Farmer participated in the conspiracy to fix prices and surcharges, allocate customers and rig bids in the Puerto Rican cabotage market as alleged herein.

26.    Robert Grune became Senior Vice President and General Manager of Crowley's Puerto Rico and Caribbean liner services business unit in June 2005 and remained in that position throughout the remainder of the conspiracy period.  Farmer

2:12-cv-01045-CWH    Date Filed 04/17/12    Entry Number 1    Page 9 of 44

reported directly to Grune, while Grune reported to Tom Crowley, Jr.  Grune participated

in the conspiracy to fix prices and surcharges, allocate customers and rig bids in the

Puerto Rican cabotage market as alleged herein.

27.    CSX Corporation ("CSX Corporation") is a Virginia corporation

headquartered in Jacksonville, Florida. CSX provides rail, intermodal, domestic-container

shipping, barging, and contract logistics worldwide, including in this District.   As set out

below, CSX Corporation is the former owner of co-conspirator CSX Lines, which

became Horizon Lines.

28.    Horizon Lines, Inc. ("Horizon") is a Delaware corporation with its

principal place of business in Charlotte, North Carolina.  It has operated as a holding

company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC; (ii)

Horizon Logistics Holdings, LLC; and (iii) Horizon Lines of Puerto Rico, Inc.

29.    Horizon Lines, LLC ("Horizon LLC") is a Delaware limited liability

company with its principal place of business in Charlotte, North Carolina.  It is an ocean

carriage containership operating subsidiary of Horizon Lines, Inc.  Horizon LLC operates

a fleet of 21 United States-flag containerships and five port terminals linking the

continental United States with Puerto Rico, Hawaii, Alaska, Guam, and Micronesia.

Horizon Lines, LLC was formerly known as CSX Lines, LLC ("CSX Lines").  During

the relevant period, particularly at the start of the conspiracy, CSX Lines was a wholly-

owned subsidiary of CSX Corporation. CSX Lines, LLC remained a wholly-owned

subsidiary until it was sold to a venture capital group in February 2003.

30.     Horizon Logistics Holdings, LLC ("Horizon Logistics") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. It is an ocean carriage management operating subsidiary of Horizon Inc.

31.     Horizon Lines of Puerto Rico, Inc. ("Horizon Puerto Rico") is a Delaware corporation with its principal place of business in San Juan, Puerto Rico.  Horizon Puerto Rico is in the business of ocean shipping and operates a marine terminal in San Juan, Puerto Rico.

32.     Horizon Lines, Inc., Horizon LLC, Horizon Logistics and Horizon Puerto Rico are hereafter collectively referred to, in this Complaint, as "Horizon."  Horizon is the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total United States maritime container shipments from the continental United States to Puerto Rico, Hawaii, Alaska, Guam and Micronesia, and approximately 35 percent of the Puerto Rican Cabotage market.  Horizon marketed and sold Puerto Rican Cabotage in the United States and in this District from at least as early as May 2002 and continuing until at last April 2008.

33.     Charles G. "Chuck" Raymond ("Raymond") is an individual residing in Charlotte, North Carolina.  Raymond was the Chairman, President, and Chief Executive Officer of CSX Lines and later Horizon Lines, Inc. during the time of the conspiracy. During the relevant period, Raymond was responsible for determining CSX Lines and Horizon's pricing for Puerto Rican Cabotage.  On information and belief, Raymond participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

34.    Gabriel Serra ("Serra") is an individual residing in San Juan, Puerto Rico. During the relevant period, Serra was the Senior Vice President and General Manager for the Puerto Rico Division of Horizon LLC and was responsible for determining Horizon's pricing for Puerto Rican Cabotage.   Serra participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

35.    As alleged herein, Serra was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

36.    R. Kevin Gill ("Gill") is an individual residing in Charlotte, North Carolina.  From at least as early as May 2002 until December 2004, Gill was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican Cabotage.  From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible for marketing Horizon's Puerto Rican Cabotage services.  Gill participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

37.    As alleged herein, Gill was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

38.    Gregory Glova ("Glova") is an individual residing in Charlotte, North Carolina.  From December 2005 until at least April 2008, Glova was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican Cabotage.  Glova participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

39.    As alleged herein, Glova was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

40.    During the conspiracy period, Tom Cowan was retained by Raymond as a "consultant" for Horizon, but Cowan served simultaneously as a consultant for Sea Star, Saltchuk, and TOTE.  Prior to serving as a consultant, Cowan was a senior vice of marketing for CSX Lines and had responsibility for the Alaskan cabotage.  On information and belief, Cowan facilitated communications between Horizon and Saltchuk about competitive issues in furtherance of the conspiracy.

41.    Trailer Bridge, Inc. ("Trailer Bridge") is a Delaware corporation with its principal place of business in Jacksonville, Florida.  Trailer Bridge offers integrated freight shipping services between the continental United States and Puerto Rico.  Trailer Bridge marketed and sold Puerto Rican Cabotage in the United States and in this District during the relevant period.  Although not named as a defendant in this case, Trailer Bridge participated in the conspiracy as alleged herein.

**Government Investigation and Prosecution**

42.    On or about April 17, 2008, FBI agents executed search warrants on the premises of Horizon, Sea Star, and Crowley regarding Puerto Rican Cabotage. That the U.S. Department of Justice used search warrants, which may only be issued based on a judicial determination of probable cause – and not simply grand jury subpoenas – underscores the seriousness of the illegal activity engaged in by the conspirators, including Defendants.

43.    Following the U.S. Department of Justice searches, Horizon issued a press release revealing that it was served with search warrants and a grand jury subpoena in connection with an investigation by the Department's Antitrust Division into the pricing practices of ocean carriers operating in the Puerto Rico trade.  (See Press Release, Horizon Lines, Inc., "Horizon Lines Issues Statement on Antitrust Investigation" (Apr. 17, 2008)).  Horizon Lines, Inc. also discussed the subpoena in a 10-Q filing dated April 25, 2008.  Horizon Lines, Inc. issued another press release on May 28, 2008 announcing that it had placed six employees involved in the Puerto Rico trade on administrative leave as a result of its review of issues raised by the DOJ's investigation. (See Press Release, Horizon Lines, Inc., "Horizon Lines Announces Personnel Administrative Action" (May 28, 2008)).

44.    Horizon Lines, Inc.'s 2008 10-K contained the following information regarding the Department of Justice's investigation: "On April 17, 2008, the Company received a grand jury subpoena and search warrant from the U.S. District Court for the Middle District of Florida seeking information regarding an investigation by the Antitrust Division of the Department of Justice ("DOJ") into possible antitrust violations in the

domestic ocean shipping business." Horizon Lines, Inc. further acknowledged that "in connection with the DOJ investigation, it is possible that the Company could suffer criminal prosecution and be required to pay a substantial fine." Horizon Lines, Inc. then explained that "[o]n October 20, 2008, three former managers of the Company plead [sic] guilty to a conspiracy to eliminate competition and raise prices for moving freight between the continental U.S. and Puerto Rico."

45.    Sea Star was also subject to a raid by the FBI on or about April 17, 2008. Following the raids, Chisholm deleted certain files that exposed the conspirators' culpability in the unlawful scheme. These files were later recovered and turned over to the DOJ.

46.    According to news reports, Crowley's Jacksonville office was likewise raided by the FBI on or about April 17, 2008, in conjunction with the FBI's investigation of anti-competitive conduct in the Puerto Rican Cabotage market.

47.    On May 15, 2008, Trailer Bridge filed a Form 10-Q in which it admitted that it, too, had been served with a subpoena by the DOJ seeking documents and information relating to a grand jury investigation of unlawful pricing practices among Puerto Rico ocean carriers.

48.    On October 1, 2008, Baci, Gill, Glova, and Serra were charged by criminal information with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. § 1, and each subsequently pleaded guilty to the charged offense.

49.    On October 20, 2008, Sea Star's Baci filed an agreement in the U.S.

District Court for the Middle District of Florida in which he agreed to plead guilty to the

criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;
>
> (e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;
>
> (f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;
>
> (g) authorized or consented to the participation of subordinate employees in the conspiracy; and
>
> (h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

50.    Pursuant to his plea agreement, Baci admitted that "[d]uring the relevant

period, [Baci] committed acts in furtherance of the conspiracy, including engaging in

discussions and attending meetings with representatives of one or more competing

providers of Puerto Rico freight services.  During such discussions and meetings,

agreements were reached between and among competitors for Puerto Rico freight

services to allocate customers, rig bids submitted to government and commercial buyers,

and to fix the prices of rates, surcharges and other fees charged to customers." (Baci Plea Agreement at 4.)

51.    Baci, who as set forth above, coordinated the implementation of the conspiracy, specifically admitted in his Pre-Sentencing Memorandum that the "companies involved with antitrust violations include[d] Sea Star, Horizon, Crowley and Trailer Bridge." (Baci's Sentencing Mem. at 8).  Further, his Pre-Sentencing Memorandum stated that  Leonard Shapiro "was someone of massive authority" who threatened and directed the termination of employment of others at Sea Star; that Baci was ordered to implement the illegal agreement reached between Shapiro and Serra; and that Baci did, in fact, implement this agreement in coordination with Horizon's Gill.  (*Id.* at 8-9.)

52.    During the sentencing hearing on January 30, 2009, the U.S. Department of Justice stated on the record that, as part of his cooperation with the Department's investigation, Baci provided the Department with, *inter alia*, "specific instances of conduct" against Crowley and Trailer Bridge.  (Jan. 30, 2009 Sentencing Tr. 56.)

53.    On January 30, 2009, Baci was sentenced to forty-eight (48) months in prison, which was "the longest jail term ever imposed for a single antitrust violation," according to the U.S. Department of Justice, for violating 15 U.S.C. § 1.

54.    On October 20, 2008, Horizon's Gill filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

(b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorized or consented to the participation of subordinate employees in the conspiracy; and

(h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

55.    Pursuant to his plea agreement, Gill admitted that "[d]uring the relevant period, [Gill] committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.  During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers."  (Gill Plea Agreement at 4.)

56.    On May 12, 2009, Gill was sentenced to twenty-nine (29) months in prison for violating 15 U.S.C. § 1.

57. On October 20, 2008, Horizon's Glova filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

"(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

(b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorized or consented to the participation of subordinate employees in the conspiracy; and

(h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

58. Pursuant to his plea agreement, Glova admitted that "[d]uring the relevant period, [Glova] committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.   During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers,

and to fix the prices of rates, surcharges and other fees charged to customers." (Glova Plea Agreement at 4.)

59.    On May 12, 2009, Glova was sentenced to twenty (20) months in prison for violating 15 U.S.C. § 1.

60.    On October 20, 2008, Horizon's Serra filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;
>
> (e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;
>
> (f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;
>
> (g) authorized or consented to the participation of subordinate employees in the conspiracy; and
>
> (h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

61.    Pursuant to his plea agreement, Serra admitted that "[d]uring the relevant period, [Serra] committed acts in furtherance of the conspiracy, including engaging in

discussions and attending meetings with representatives of one or more competing

providers of Puerto Rico freight services. During such discussions and meetings,

agreements were reached between and among competitors for Puerto Rico freight

services to allocate customers, rig bids submitted to government and commercial buyers,

and to fix the prices of rates, surcharges and other fees charged to customers." (Serra

Plea Agreement at 4.)

62.     In the U.S. Department of Justice's Pre-Sentencing Memorandum filed

May 4, 2009, the Department described Serra as having played "an integral role in

dealing with other senior executives involved in the conspiracy." (*Id.* at 7.)

63.     On May 12, 2009, Serra was sentenced to thirty-four (34) months in prison

for violating 15 U.S.C. § 1.

64.     On October 1, 2008, Chisholm was charged by criminal information with

corruptly altering, destroying, and concealing records and documents and attempting to

do so with the intent to impair the availability of the records and documents for use in a

federal grand jury investigation in violation of 18 U.S.C. § 1512(c)(1).

65.     Chisholm pleaded guilty to altering, destroying, and concealing documents

to impair the government's investigation.

66.     According to Chisholm's Pre-Sentencing Memorandum dated May 5,

2009: "Mr. Chisholm's role in the underlying conspiracy to violate the antitrust laws was

that of a numbers cruncher. The government has described Mr. Chisholm as one of the

key implementers, and that description is apt if one means by it that, as one of the three

Directors of Pricing, he put into action plans made by others. Mr. Chisholm received

pricing information about Sea Star's competitors from Baci, who was in direct

communication with his counterparts at Horizon and Crowley.  Using the competitors'

pricing information and following directions from Baci, Mr. Chisholm would re-do the

bid for his customers."  (Pre-Sentencing Mem. at 5.)

67.    During the sentencing hearing on May 12, 2009, the U.S. Department of

Justice stated on the record that "[t]his was a conspiracy that was conducted in significant

part through emails and spreadsheets.  And the spreadsheets contained detailed market

share information, customer information, and contact information that were circulated

between the co-conspirators."  (May 12, 2009 Sentencing Tr. 104.)

68.    On May 12, 2009, Chisholm was sentenced to seven (7) months in prison

for violating 15 U.S.C. § 1.

69.    On March 15, 2011, Horizon Lines pleaded guilty to participating in a

conspiracy to fix prices for Puerto Rican Cabotage and agreed to pay a $45 million

criminal fine.

70.    On April 28, 2011, Horizon Lines' fine was reduced to $15 million in

consideration of the company's financial condition and in anticipation of its need to pay

restitution to the victims of the conspiracy.

71.    As set forth in the plea agreement, Horizon Lines, "through certain of its

officers and employees, including high-level personnel . . . participated in a conspiracy

with other providers of Puerto Rico freight services, a primary purpose of which was to

suppress and eliminate competition by fixing rates and surcharges charged to customers

for Puerto Rico freight services."  (Horizon Plea Agreement at 4.)

72.    During the relevant time, Horizon Lines "[i]n furtherance of the

conspiracy . . . through certain of its officers and employees, engaged in discussions and

attended meetings with representatives of other providers of Puerto Rico freight services"
through which "agreements were reached to fix the rates and surcharges to be charged to
customers."  (Horizon Plea Agreement at 4.)

73.    On November 17, 2011, Defendant Sea Star pleaded guilty to participating
in a conspiracy to fix prices for Puerto Rican Cabotage and agreed to pay a $14.2 million
criminal fine.

74.    As set forth in the plea agreement, Sea Star, "through certain of its officers
and employees, including high-level personnel . . . participated in a conspiracy with other
providers of Puerto Rico freight services, a primary purpose of which was to suppress
and eliminate competition by fixing rates and surcharges charged to customers for Puerto
Rico freight services."  (Sea Star Plea Agreement at 4.)

75.    During the relevant time, Sea Star, "[i]n furtherance of the conspiracy . . .
through certain of its officers and employees, engaged in discussions and attended
meetings with representatives of other providers of Puerto Rico freight services" through
which "agreements were reached to fix the rates and surcharges to be charged to
customers."  (Sea Star Plea Agreement at 4.)

76.    Also on November 17, 2011, Peake was indicted with one count of
conspiracy to suppress and eliminate competition by rigging bids, fixing prices and
allocating customers in violation of 15 U.S.C. § 1.  The indictment alleges that Peake
"did enter into and engage in a combination and conspiracy to suppress and eliminate
competition by agreeing to fix rates and surcharges for Puerto Rico freight services.  The
charged combination and conspiracy consisted of a continuing agreement, understanding,
and concert of action among the defendant and his co-conspirators, the substantial terms

of which were to fix rates and surcharges for Puerto Rico freight services.  The

combination and conspiracy engaged in by the defendant and his co-conspirators was in

unreasonable restraint of interstate trade and commerce.  All in violation of Title 15,

United States Code § 1."  (Peake Indictment at 2.)

77.     Specifically, the Indictment alleges that Peake conspired with others to

perform the following unlawful acts:

"(a) participating in meetings, conversations, and communications in the
continental United States and Puerto Rico to discuss customers, rates, surcharges
and bids for the sale of Puerto Rico freight services;

(b) agreeing during those meetings, conversations and communications to allocate
customers of Puerto Rico freight services between and among the conspirators;

(c) agreeing during those meetings, conversations, and communications to fix,
stabilize, and maintain rates and surcharges charged to customers of Puerto Rico
freight services;

(d) agreeing during those meetings, conversations, and communications to rig
bids submitted to government and commercial customers of Puerto Rico freight
services;

(e) engaging in meetings, conversations and communications for the purpose of
monitoring and enforcing adherence to the agreed-upon rates and surcharges; (f)
selling Puerto Rico freight services at collusive and noncompetitive rates and
surcharges pursuant to the agreements reached;

(g) accepting payment for Puerto Rico freight services at collusive and
noncompetitive rates and surcharges; and

(h) authorizing and consenting to the participation of subordinate employees in
the conspiracy."

78.     Defendant Peake entered a plea of not guilty on December 15, 2011.  The

case is currently pending in the United States District Court for the District of Puerto

Rico.

79.     The government's investigation is ongoing and, upon information and

belief, additional indictments are expected.

## ALLEGATIONS OF FACT

I.    **The Puerto Rican Cabotage Market**

80.    Ocean transport is a highly effective method for moving large quantities of non-perishable goods and raw materials. The major commodities shipped through domestic ocean shipping include manufactured goods, farm products, coal, crude petroleum, refined petroleum products and chemicals.

81.    Because ocean cabotage is the most cost-effective means of delivering products to Puerto Rico, the territory is dependent upon ocean transport to obtain both leisure and necessary products for its population of approximately four (4) million residents.    For most products, air transport is cost-prohibitive and even physically impractical for delivery to Puerto Rico.

82.    The Puerto Rican trade lane is considered a "domestic offshore trade" or "noncontiguous domestic trade."  Pursuant to 49 U.S.C. § 13102(17), "noncontiguous domestic trade" is defined as domestic water carrier transportation "involving traffic originating in or destined to Alaska, Hawaii, or a territory or possession of the United States."

83.    The operation of a "domestic offshore trade" is governed by the Merchant Marine Act of 1920, 46 U.S.C. § 101, *et seq.*, commonly referred to as the Jones Act. The Jones Act requires that vessels carrying merchandise in such a trade be U.S.-flagged, U.S.-owned, predominately U.S.-crewed, and be owned and operated by U.S.-organized companies that are predominately controlled by U.S. citizens.

84.    The Jones Act provides no statutory or other antitrust immunity to Defendants for the collusion, customer allocation, bid rigging, or price-fixing of Puerto Rican Cabotage as alleged herein.

85.    The Jones Act produced the effect of creating a highly concentrated market for ocean transport of goods between the United States mainland and Puerto Rico. Specifically, at all relevant times, the Puerto Rican Cabotage market has been a highly concentrated oligopoly controlled by Horizon, Sea Star, Crowley, and Trailer Bridge. This effect made the market susceptible to coordinated, anticompetitive behavior by its participants, as alleged herein.  This susceptibility occurs because it is relatively easy for a smaller group of sellers to reach agreement on customer allocation, bid-rigging and prices, and to monitor adherence to the unlawful agreements reached by the conspirators.

86.    Also, as a consequence of concentrated market, individual industry participants, including several named in this complaint, worked for multiple carriers at different times.  For example, Peake worked at Horizon prior to becoming president of Sea Star; Baci worked for Crowley prior to becoming a senior vice president at Sea Star; Chisholm worked for Crowley prior to becoming a pricing director at Sea Star; and Miskowiec worked for Crowley prior to becoming a vice president at Trailer Bridge.

87.    In addition, the market conditions and nature of the service facilitated the anti-competitive conduct that is alleged here.  Puerto Rican Cabotage is a highly fungible service.  The nature of the service involves merely the transportation of goods from an originating port to a destination port according to a defined schedule.  Horizon and Sea Star provide this service by operating self-powered, "blue water" vessels; Crowley and Trailer Bridge provide this service as tug-barge carriers.  Although some customers may

need or prefer the speed provided by vessel carriers, all four carriers generally can and do compete for the same Puerto Rican Cabotage business.

88.     Because there is not significant differentiation regarding the service provided, price is a primary factor in the selection of a carrier by a customer. Consequently, rate competition among the carriers in a competitive market is fierce, and customers will often switch carriers in order to obtain a better rate.  Such competition did not exist in the Puerto Rico market during the relevant time due to the unlawful behavior of Defendants and their co-conspirators.

89.     There are no viable economic substitutes for Puerto Rican Cabotage services provided by the Defendants and their co-conspirators.  The transportation of goods to an island such as Puerto Rico must be accomplished by air or water, and the expense and limited capacity of air freight makes air transport an impractical option for most customers.

90.     There are substantial barriers to entry for new market participants in the Puerto Rican Cabotage industry.  The cost of obtaining a ship or fleet of ships and operating in compliance with the Jones Act requirements is substantial, and no new participant has joined the Puerto Rican Cabotage market since the beginning of the conspiracy period.  On the contrary, as described below, Defendants and their co-conspirators were able to reduce the number of market participants and thus reduce capacity through unlawful conduct.  In addition, the Jones Act effectively excludes many existing ocean freight carriers that could otherwise compete with the Defendants and their co-conspirators because they do not operate U.S.-flagged, U.S.-built, predominately U.S.-crewed ships.

91.    The demand for Puerto Rican Cabotage services is highly inelastic because these services provide the bulk of the everyday needs of the Puerto Rican population, including necessities related to food, clothing, and shelter.  Consequently, an increase in the price of Puerto Rican Cabotage services does not cause a significant decrease in the demand for those services.

92.    The combination of market conditions found in the Puerto Rican Cabotage market – including a small number of competitors, high barriers to entry, fungibility, a lack of economic substitutes, inelastic demand, and statutory protection from international competition – provided an ideal environment to effectuate an anticompetitive conspiracy, as occurred here.

## II.    The Conspiracy Created by Defendants and Co-Conspirators

93.    Beginning at least as early as May 2002 and continuing until at least April 2008, Defendants and others engaged in a continuing agreement, understanding and conspiracy in unlawful restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican Cabotage.

94.    The genesis of this conspiracy can be traced back at least as early as the bankruptcy of Navieras NPR ("Navieras"), one of the key participants in the Puerto Rican Cabotage market prior to 2001.  The Puerto Rican government established Navieras de Puerto Rico in the early 1970s to address the lack of competition in the Puerto Rican Cabotage market.  However, over the next twenty years, Navieras accrued and continued to operate with significant losses, eventually totaling in excess of $350 million.

Nevertheless, Navieras regularly offered lower rates that forced Sea Star, CSX, Crowley, and Trailer Bridge to offer similarly low rates, as well.

95.    In March 1995, the government of Puerto Rico approved the sale of Navieras de Puerto Rico to BT Investment Partners, Inc., a wholly owned subsidiary of Bankers Trust New York, in exchange for $29.5 million in cash and approximately $100 million of the debt accrued by Navieras de Puerto Rico.

96.    The Navieras entity was later resold in November 1997 to Holt Hauling and Warehousing Systems, which was part of the Holt Group.  On March 21, 2001, the Holt Group filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware in connection with a default of approximately $140 million of junk bonds.

97.    Pursuant to the agreed-upon plan for bankruptcy, the Navieras ships and other assets were to be sold to Sea Star for $32 million subject to an auction to be conducted by the Bankruptcy Court.  Thus, at the beginning of April 2002, Sea Star announced that it planned to purchase the Navieras assets and expand the number of sailings to Puerto Rico.

98.    Although CSX Lines CEO Chuck Raymond publicly stated that his company intended to attend the Bankruptcy Court auction and possibly bid on the Navieras assets, it never submitted a bid prior to the April 22, 2002 deadline.

99.    Indeed, on or around April 20, 2002, shortly before the sale of the Navieras assets to Sea Star became final, CSX Lines' Gill received a call from his boss, Serra, the Vice President and General Manager of CSX Lines Puerto Rico Operations, instructing Gill to join Serra for a meeting with representatives of Sea Star in Charlotte, North Carolina.

100.    On April 24, 2002, Chuck Raymond, Jim McKenna, Serra, and Gill of CSX Lines met with Robert Magee, Peter Baci, and Leonard Shapiro of Sea Star/Saltchuk/TOTE, at the Park Hotel located across the street from the CSX Lines headquarters in Charlotte.

101.    The general purpose of the meeting was to discuss how to effectively operate the Puerto Rico market going forward, including how to address the Navieras business, ships and sailings that Sea Star would obtain.  The conspirators particularly focused on controlling oversupply of shipping capacity in the Puerto Rican cabotage market.  The leadership of Sea Star and CSX Lines discussed how many ships were needed to support the Puerto Rico trade and how they could work together to prevent excess capacity.

102.    The result of the meeting was an agreement, memorialized in a handwritten contract, whereby none of the four vessels that Sea Star was to acquire from Navieras would be used to service Puerto Rico.  Under the agreement, Sea Star would simply scrap three of the ships.  Consequently, it would not – and could not – provide the additional sailings that it previously announced and that were formerly offered by Navieras.

103.    In addition, as Raymond put it, CSX Lines needed to have "some skin in the game" and thus agreed to buy one of the former Navieras ships from Sea Star for over $5 million, and immediately remove the ship from the Puerto Rico lane.

104.    CSX Lines also agreed to allow Sea Star to ship goods on CSX Lines-owned ships so as to alleviate the need to bring in additional ships.  The parties also agreed on who would ship on which days and from which ports.

105.    The only known copy of the handwritten agreement arising from the Park Hotel meeting and initialed by participants was in the possession of Gill, who retained it despite being instructed by Raymond to destroy it.

106.    As a result of Navieras' exit, the market for shipping services between the mainland United States and Puerto Rico became highly concentrated and conducive to an unlawful price-fixing conspiracy.

107.    Immediately following the Park Hotel meeting, CSX Lines announced a 10% price increase in Puerto Rico.

108.    Between 1999 and 2003, CSX Lines operated as a wholly owned subsidiary of CSX Corporation.  On or about January 4, 2002, CSX Corporation entered into a Transaction Incentive Program Agreement with Chuck Raymond, the President and CEO of CSX Lines, in anticipation of a possible strategic transaction involving CSX Lines.  This agreement provided that Raymond would be entitled to an incentive bonus of up to $1.5 million dollars, payable by CSX Corporation, if there was a closing of a sale or other disposition of CSX Lines prior to December 2002, and the CSX Corporation Chairman determined "in his sole discretion that [Raymond had] given a superlative performance in helping CSX to exceed its objectives" in the transaction.  In November 2002, CSX Corporation and Raymond amended the agreement to require that the closing occur prior to June 30, 2003.  The bonus payment was to be paid in two equal installments, the first payment occurring within one month of closing and the second on the first anniversary of the closing.

109.    Thus, in April 2002, when Raymond met with Sea Star, Saltchuk and TOTE representatives in order to restrict supply and divide markets in connection with

the Navieras auction described above, and during the months that followed when he and those who reported to him acted in furtherance of the illegal conspiracy as set out below, Raymond knew that by artificially manipulating the market for Puerto Rican Cabotage services through these illegal discussions and agreements, he could increase the value of CSX Lines, thereby increasing his chances of receiving the bonus promised by CSX Corporation.

110.    After the Park Hotel meeting, Gill began communicating with Peter Baci of Sea Star to coordinate the effects of the expiring former Navieras contracts on the market to ensure that prices went up and market shares were sustained.

111.    In late April 2002, Sea Star's Baci and CSX Lines' Gill met at a CSX Lines-owned apartment in Charlotte for most of the day, and Baci and Gill reviewed Sea Star's customer-specific market plans.  During the meeting, Gill and Baci discussed various market segments and reached agreements about appropriate price increases, specifically targeting an initial increase of ten (10) percent.  Recognizing this price increase could not be obtained immediately, they developed and later implemented a plan to attack "low hanging fruit," such as eliminating bunker fuel exceptions.  They also developed a tier system for FAK ("freight all kind") customers.  Lastly, they agreed to continue working together on key accounts as they came up for renewal and coordinate contract end dates to control prices, sharing all the information necessary to do so.

112.    After this initial meeting, Gill and Baci continued to communicate on these issues through frequent emails and phone conversations.  When issues arose that they could not resolve the conversations were elevated to the Serra- and Peake-level, and sometimes up to Raymond and Magee.

113.    Baci often recorded these unlawful pricing agreements in a notebook, which he regularly consulted when advising his pricing managers as to the specific prices to charge various customers. The notebooks verify that Plaintiff's business was a subject of conversation between Baci and Sea Star's co-conspirators. When asked by a manager whether the pricing contained in this notebook violated the antitrust law, Baci explained "not to worry because Sea Star had their backs." Sea Star employees feared that if they deviated from the pricing contained in Baci's notebook, they would be summarily terminated from the company. These threats emanated from the highest ranking officers of Sea Star and Saltchuk, including Shapiro.

114.    On February 27, 2003, CSX Corporation conveyed its majority interest in CSX Lines to a new joint venture formed with the Carlyle Group for approximately $300 million including $240 million in cash and $60 million in senior preferred securities in CSX Lines. In conjunction with this transaction, CSX Lines changed its name to Horizon Lines, and CSX Corporation also agreed to sublease certain ships to Horizon through 2014. In July 2004, the Carlyle Group sold Horizon Lines to a private equity firm named Castle Harlan for $650 million and at that time CSX redeemed its preferred securities in Horizon. The amounts CSX Corporation received as a result of these transactions were increased by virtue of the illegal and anticompetitive scheme undertaken by Raymond and his agents on behalf of CSX Corporation and CSX Lines.

115.    As alleged herein, Tom Cowan was retained as consultant by Horizon, as well as Sea Star/TOTE/Saltchuk, and served to facilitate communication between the conspirators. For example, on February 28, 2003, Cowan spoke with Gill about a meeting he had with Saltchuk's Robert Magee and another person (possibly Shapiro) and

explained that it was Saltchuk's position that Horizon was pushing too hard on the bunker fuel surcharge. The concern was that if fuel prices fell, the customers would expect a reduction in the bunker fuel surcharge. Thus, Saltchuk wanted Horizon to emphasize increasing base rates, which would remain in place regardless of whether the fuel price later dropped.

116.    Beginning in at least April 2003 and continuing until at least April 2008, Baci met with his counterparts at Horizon to discuss pricing at so-called "TSA Meetings." These meetings were ostensibly held to discuss borrowing container space in competitor vessels. However, the meetings were also used to discuss illegal price fixing. The meetings took place on a quarterly, and sometimes monthly, basis. For example, one such meeting took place on October 26, 2005 at Ponte Vedra between Saltchuk's Mark Tabbutt and Bob Magee and Horizon's Chuck Raymond and John Keenan (Horizon's COO).

117.    On or about June 26, 2003, Serra and Shapiro met for approximately four hours at the Omni Hotel's restaurant near the Dallas-Fort Worth airport to address Horizon's complaints to Sea Star about market behavior in Puerto Rico. Shapiro proposed that the Puerto Rico market adopt what he called the "Alaska Model." In Alaska, Horizon and TOTE were the only competitors, and they shared the cabotage business equally. This resulted in stable market shares, loyal customers, and very little price competition.

118.    Serra and Shapiro agreed that Horizon and Sea Star would adopt the Alaska model in Puerto Rico. Specifically, they agreed that Horizon and Sea Star would each be entitled to a 50% share of the southbound "blue water" vessel business on

sailings from Jacksonville, Florida to Puerto Rico.  Although the specifics of how the

agreement would be addressed at a subsequent meeting as alleged herein, the concept

discussed was to share pricing information, not compete on price, and adjust market share

from time to time by ceding business to one another when necessary to maintain the

50-50 market division.

119.    Upon returning from this meeting, Shapiro went to Baci's office at Sea

Star and told Baci of the meeting with Serra and their agreement that Horizon and Sea

Star would share the Puerto Rican Cabotage "blue water" business on a 50-50 basis so

that Baci could begin to carry out the agreement, which he did.

120.    Following the Serra and Shapiro meeting, the information sharing

between Sea Star and CSX Lines/Horizon intensified further.  Price information sharing

was generally conducted between Baci and Gill.  Baci created so-called "Who shot John"

lists for specific problems that he encountered with Horizon.  He provided the lists to

Peake, who met with Serra in Puerto Rico periodically to address the issues.  Thus, more

difficult issues were elevated to Peake and Serra, but occasionally these issues reached

the CEO-level of Raymond and Magee.

121.    On December 11, 2003, Horizon's CEO Raymond wrote a handwritten

letter to Horizon managers, including Serra and Gill, notifying them that Leonard Shapiro

of TOTE was joining the board of Saltchuk.  Raymond explained that he had a

conversation with "Saltchuk folks" and "was reassured this has no impact whatsoever on

the Corporate pricing philosophy."  Raymond added instructions to the top of the note:

"Please read and destroy."  This communication was intended to assure the individual

conspirators at Horizon that the conspiracy would not be interrupted by Shapiro's transition, and, as alleged herein, it was not.

122.    In 2005, Sea Star raised the notion of bringing another ship into the Puerto Rican Cabotage market.  Specifically, on August 19, Saltchuk's Robert Magee emailed Raymond about Sea Star's plan to add a third ship to its Puerto Rico service and sought to assure Horizon that Sea Star would be "responsible" regarding its rates despite adding another vessel.

123.    Horizon, fearing that the additional ship would cause oversupply and lead to lower prices, objected.  Thereafter, Horizon's Raymond and Saltchuk's Robert Magee met and communicated on numerous occasions to attempt to coordinate these market supply issues.

124.    On October 26, 2005, Saltchuk's Robert Magee and Mark Tabbutt met with Horizon's Raymond and John Keenan in Ponte Vedra, Florida to discuss the capacity issues related to Puerto Rican Cabotage, including Sea Star's proposed third ship.

125.    Horizon's Gill was aware that he was participating in an unlawful conspiracy and retained key documents and emails, despite being instructed to destroy them, in order to show that his actions were conducted with the knowledge and often under the instruction of his superiors at Horizon.

126.    By late 2005, Gill was so uncomfortable with his participation in the obviously illegal activities that he asked to be moved to a new position.  Horizon obliged by promoting Gill.  Serra and Gill selected Gregory Glova to replace Gill.

127.     In January 2006, Gill set up a meeting to introduce Glova to Baci at the Lodge Alley Inn in Charleston, South Carolina.  At that meeting, Gill and Baci disclosed the details of the conspiracy to Glova and explained what Glova's role would be going forward.

128.     After this meeting, Glova immediately became active in the conspiracy and began coordinating directly with and frequently with Baci, Trailer Bridge's David Miskowiec and Crowley's Tom Farmer about key accounts and in furtherance of all aspects of the conspiracy.

129.     In August 2006, Sea Star's Peake and Baci met with Horizon's Serra and Glova in Orlando, Florida to discuss the 50-50 split of the Puerto Rico Cabotage market and determine the specifics of how the agreement would work with respect to refrigerated containers, or "reefers."

130.     On October 24, 2006, Sea Star's Peake and Baci met with Horizon's Serra and Glova again in Orlando to review market share information and reach agreements about specific customers.

131.     Sea Star's Peake and Baci and Horizon's Serra, Gill, and later Glova were in regular communication at all times following the initial April 2002 meetings and met in order to coordinate pricing and volume on customer accounts in a purposeful effort to maintain the 50-50 market division described herein.  Such communication was necessary to account for contract renewals, volume reductions and/or increases, and unanticipated carrier changes by customers.

132.     These individuals also developed what became known as "sacrificial lambs" lists, which identified customers that one company was willing to give up to

another in the event that market shares shifted in a manner inconsistent with the industry

agreement.  On information and belief, they did, in fact, use these lists to maintain

proportional market shares and preserve the operation of the conspiracy.

### Crowley and Trailer Bridge's Participation in the Conspiracy

133.    Crowley and Trailer Bridge also participated in this conspiracy soon after

it began.

134.    Baci had been a long-time Crowley employee before joining Sea Star.

While at Crowley, Baci had met and developed relationships with Chisholm and Tom

Farmer ("Farmer"), who worked for Baci, at Crowley, for approximately ten years.

Farmer participated in the conspiracy on Crowley's behalf, and worked with Baci to

implement the conspiracy, as more fully described below.

135.    Farmer communicated regularly with Baci, Gill, and later Glova and

agreed to fix prices for Puerto Rican Cabotage and participated in the allocation of

customers among Sea Star and Horizon.    Farmer, Baci, and Gill/Glova agreed to both

general rate increases related to classes of freight and fuel surcharges, as well as rates to

specific customers when such contracts were due for renewal.  They also communicated

for purposes of rigging bids to certain customers including Plaintiff.

136.    On many occasions, the specific dates being known only to the

conspirators, the conspirators met to discuss specifics of the conspiracy.

137.    For example, in 2007, Farmer met with Sea Star's Baci, Ed Pretre, and

Chisholm, at a breakfast meeting at the University Diner in Jacksonville, Florida.  On

information and belief, Baci and Farmer discussed and exchanged pricing at this meeting.

138.    Farmer's boss, Rob Grune, met with Serra in furtherance of the conspiracy on numerous occasions, including meetings in April, July and October 2006, January and June 2007, and April 2008 in various locations, primarily Florida and Puerto Rico.  The earlier meetings focused on general concepts of market behavior and the need to work together to keep prices up, while later meetings addressed coordination of specific prices to specific customers.  Grune had similar meetings and discussions with Sea Star's Frank Peake, who lived near him.

139.    Crowley's CEO Tom Crowley, Jr. also met or talked with Horizon's Chuck Raymond on several occasions in an effort to coordinate the market, stabilize shares and increase prices particularly when issues arose that their subordinates could not resolve.

140.    Crowley utilized barges rather than "blue water" vessels used by Horizon and Sea Star, and consequently it generally charged lower rates.  However, Crowley, Sea Star and Horizon agreed that they would try to maintain a "spread" of approximately $300 between "blue water" rates and barge rates.

141.    Crowley, Sea Star, and Horizon also agreed not to target each other's key customers and to work to maintain market shares.

142.    Horizon, Sea Star, and Crowley had similar conversations and agreements with Trailer Bridge.  For example, Baci had discussions with David Miscoweic, Vice President of Sales for Trailer Bridge, who he previously knew from working together at Crowley.  These discussions included plans for pricing to customers, categories of customers and bunker fuel surcharges and directly resulted in Trailer Bridge raising its prices and surcharges.

143.    Upon information and belief, the coordination with Trailer Bridge broadened over time, and Miscoweic held similar conversations with Crowley's Farmer and Horizon's Gill and Glova.

144.    Upon information and belief, Miskowiec was placed on administrative leave for a period of time with respect to the allegations in this Complaint.

### Additional Acts in Furtherance of the Conspiracy

145.    Defendants and their co-conspirators routinely shared contract logs containing customer volumes and contract expiration dates for every major customer in the Puerto Rican cabotage market.  Certain customers split their shipping volumes among Crowley, Sea Star, Trailer Bridge, and Horizon, and those carriers agreed to maintain their respective share volumes.  The information these conspirators shared allowed the conspirators to coordinate their bid-rigging efforts to ensure that the largest volume carrier for each customer set the rates with that customer and that the remaining carriers would not underbid.

146.    Sea Star's Baci would periodically prepare a listing of the top 100 Puerto Rican Cabotage customers, known as the "Hall of Fame" list.  Baci shared the "Hall of Fame" list with competitors, and, for certain key accounts, the conspirators would designate the carrier with the greatest volume on the account as the primary carrier(s) so that other carriers would know not to interfere with that business.  For example, in October 2006, Baci sent such a list to Horizon, and the list identified Home Depot as a top account that was designated as a Crowley account.

### III.     Effects of the Conspiracy

147.     The conspiracy to fix rates and surcharges, allocate customers, and artificially limit capacity alleged herein allowed Defendants and their co-conspirators to stabilize and increase prices for Puerto Rican Cabotage throughout the conspiracy period.

148.     During the conspiracy period, the Defendants and their co-conspirators were able to obtain and sustain rate increases despite significant decreases in the volume of containers shipped.  For example, between 2003 and late 2007, Sea Star improved its net-to-vessel amount by over 45% or nearly $800 per container.  Horizon's revenue from its general rate increases jumped from $16,700,00 in 2004 to over $51,578,000 by 2007. Upon information and belief, Trailer Bridge and Crowley experienced similar revenue increases.

149.     The rate improvements alleged herein were a direct result of the conspiracy.  After the conspiracy was exposed to the public by the U.S. Department of Justice investigation, rates charged by Defendants and their co-conspirators began to fall to more competitive levels as the effects of the conspiracy dissipated.

### IV.     Fraudulent Concealment of the Conspiracy

150.     During the conspiracy period, Defendants and their co-conspirators took measures to purposely and fraudulently conceal their unlawful activities from being discovered by Plaintiff or the general public.  This affirmative conduct was designed to and did prevent Plaintiff from discovering the facts comprising this conspiracy.

151.     Plaintiff did not and could not have discovered through the exercise of reasonable diligence even the possible existence of the conspiracy alleged herein until at least April 17, 2008, when Horizon publicly announced that it was served search warrants

and a grand jury subpoena relating to an investigation of pricing practices of ocean

carriers operating in the Puerto Rico trade.

152.    Because all of the material facts were exclusively in the hands of the

Defendants and their co-conspirators, and because the U.S. Department of Justice did not

and would not disclose the findings of its criminal investigation, Plaintiff did not and

could not have discovered factual details about the conspiracy until October 1, 2008,

when the U.S. Department of Justice announced certain details about the conspiracy in

connection with the indictments of Baci, Gill, Glova, and Serra.

153.    As alleged herein, Baci, Gill, Glova, and Serra all pleaded guilty to

participating in the conspiracy and, *inter alia*, engaging in efforts to conceal its existence.

154.    To conceal the conspiracy from customers and the authorities, Gill, Glova,

and Baci used secret email accounts separate from their customary business email

accounts to communicate with each other, *e.g.*, "Lighthouse123" for Baci and "Ann

Clark" for Gill.  They also used disposable cell phones to communicate with each other.

Further, they falsified expense reports in order to cover up their illegal behavior.

155.    The conspirators also provided false information to customers concerning

rates, surcharges, and offers.  For example, the conspirators provided false or pretextual

information to customers concerning the reasons for increases in rates.  Additionally, the

conspirators designated key customers belonging to each company as so-called "Hall of

Fame" accounts.  Conspirators who did not "own" a particular Hall of Fame account

would still make sales calls on those accounts in order to keep up the appearance of

competition.  However, as alleged herein, they frequently made uncompetitive offers for

such business, thus ensuring that each company kept its key accounts and that prices did not drop.

156.    The fraudulent concealment alleged herein, which made it impossible for Plaintiff to uncover the existence of the conspiracy, had the effect of equitably tolling the running of any applicable statute of limitations as to any of Plaintiff's claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

157.    Pursuant to 15 U.S.C. §16(i), the investigation of the U.S. Department of Justice, which the Department confirmed was ongoing in a press release from November 2011, also has the effect of tolling the running of the statute of limitations as to any of Plaintiff's claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

158.    The filing of the putative class actions related to anticompetitive conduct in the Puerto Rican Cabotage market, which were consolidated into multi-district litigation in the United States District Court for the District of Puerto Rico, had the effect of tolling the statute of limitations as to any of Plaintiff's claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

## COUNT 1

159.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 159 of this Complaint.

160.    Beginning at least as early as May 2002 and continuing until April 2008, Defendants, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in

restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican Cabotage in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

161.    Defendants' unlawful conduct resulted in artificially high, supra-competitive prices charged by Defendants and their co-conspirators to Plaintiff.

162.    Plaintiff paid more for Puerto Rican Cabotage services than it would have paid in a competitive market unfettered by Defendants' and their co-conspirators' unlawful anticompetitive activity.

163.    Plaintiff seeks to recover three times its overcharge damages that it suffered as a result of this conspiracy, plus interest, attorneys' fees and costs of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury and judgment against Defendants as follows:

(a) following the jury trial, a judgment against the Defendants, jointly and severally, in accordance with the jury's findings regarding the scope, extent, and duration of the conspiracy, for three times the damages awarded by the jury;

(b) a judgment against the Defendants, jointly and severally, in accordance with the jury's findings regarding the members of the conspiracy, for an award of the Plaintiff's costs and reasonable attorneys' fees;

(c) a declaratory judgment that the unlawful combination and conspiracy alleged herein was in fact in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d) an injunction against repeated violations of the antitrust laws of the United States, upon such terms as the Court finds just, but including an order under appropriate state and federal laws either debarring the liable defendants from government contracting or requiring the notification of all state and federal entities with statutes or regulations providing for the potential debarment of contractors for violations of the antitrust laws; and

(e) for such other and further relief as the nature of the case may require or as may seem just and proper to the Court.

BARNWELL WHALEY
PATTERSON & HELMS, LLC


By: s/John A. "Jay" Jones, Esq.
    Federal ID 09479
    885 Island Park Drive (29492)
    P.O. Drawer H
    Charleston, SC 29402-0197
    (843) 577-7700

*Counsel for Plaintiff Home Depot U.S.A., Inc.*


April 17, 2012
Charleston, South Carolina