IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| HOME DEPOT U.S.A., INC. <br><br> PLAINTIFFS, <br><br> VS. <br><br> SEA STAR LINE, LLC; SALTCHUCK RESOURCES, INC.; TOTEM OCEAN TRAILER EXPRESS, INC. ; AND LEONARD SHAPIRO, <br><br> DEFENDANTS. | Case No. 2-12-cv-1045-CWH |

### DEFENDANT LEONARD SHAPIRO'S MOTION TO STAY PROCEEDINGS AND SUPPORTING MEMORANDUM OF LAW

Defendant, Leonard Shapiro ("Mr. Shapiro"), moves this Court for a stay of all proceedings brought against him[1] in this action by Plaintiff, Home Depot U.S.A., Inc. ("Plaintiff"), showing this Court as follows:

### Background and Request for Relief

**A.     The Puerto Rican Cabotage Litigation.**

1.     Following a criminal investigation by the United States Department of Justice, a number of plaintiffs filed various suits against certain of the defendants that are the subject of this action for their alleged involvement in a conspiracy to illegally fix waterborne cabotage prices between the U.S. and Puerto Rico from May 1, 2002 to April 17, 2008. Although the cases were initially filed in various districts across the United States, the cases were sent to the United States District Court for the District of Puerto Rico, captioned *In re Puerto Rican*

---

[1] Defendant Mr. Shapiro seeks only a stay of all proceedings against him in this action, and not a stay of the entire proceedings or the claims being pursued by Plaintiffs against the remaining, above-named co-defendants. As such, a stay as to Mr. Shapiro only will not impact the practical ability of the Plaintiffs to achieve the remedy being sought in this litigation (as further explained below).

*Cabotage Antitrust Litigation* (the "MDL"), and consolidated to be handled as a multi-district litigation.

2. In the MDL proceedings, upon information and belief, the United States requested and received a stay of all discovery as it related to certain defendants that were parties to the MDL proceedings.

3. Mr. Shapiro also requested a stay of all MDL proceedings brought against him and ultimately filed a renewed motion pursuant to the MDL Court's instructions; however, the MDL Court never issued a ruling on Mr. Shapiro's renewed motion prior to resolution.

4. On August 25, 2010, the MDL Court granted preliminary approval for the settlement reached with a number of the defendants in the MDL proceedings (the "Settlements").[2] Importantly, the MDL Court concluded that the settlement negotiations were conducted at arm's length and that the parties were sufficiently informed by the limited discovery that occurred. (Docket Nos. 800 and 801).

5. On August 30, 2011, the MDL Court issued an Order granting final approval of the Settlements. (Docket No. 999).

**B.    The Complaint filed in this action and the criminal conduct alleged therein.**

6. On or about April 17, 2012, the Plaintiff, which opted out of the MDL Settlements, filed the Complaint against (i) Sea Star Line, LLC, (ii) Saltchuk Resources, Inc., (iii) Totem Ocean Trailer Express, Inc., and (iv) Leonard Shapiro (collectively, the "Defendants").

---

[2] The following defendants in the MDL proceedings were parties to the settlement: Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics Holdings, LLC, Horizon Logistics, LLC and Horizon Lines of Puerto Rico, Inc.; Crowley Maritime Corp., Crowley Liner Services, Inc.; Sea Star Line, LLC, American Shipping Group, Inc., Saltchuk Resources, Inc. and Leonard Shapiro; and Alexander Chisholm. (Docket No. 800).

7. In the Complaint, the Plaintiff alleges that the Defendants were involved in a conspiracy to unlawfully restrain trade:

> Beginning at least as early as May 2002 and continuing until at least April 2008, Defendants and others engaged in a continuing agreement, understanding and conspiracy in unlawful restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican Cabotage.
>
> Complaint, ¶ 93.

8. As a result of their involvement in the alleged conspiracy that is the subject of this Complaint, a number of individuals (i) have been indicted by the United States Department of Justice, (ii) have pled guilty to criminal conspiracy charges, and (iii) are serving time in prison. *Id.*, ¶¶ 42-79. The government's investigation is ongoing and additional indictments are expected. *Id.*, ¶ 79. By way of example, Frank Peake ("Peake"), who was the Chief Operating Officer and President of Sea Star, was indicted by the United States Department of Justice with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. §1. *Id.*, ¶¶ 12, 76. More specifically, Peake allegedly conspired with others to perform the following unlawful acts:

> (i) participating in meetings, conversations, and communications in the continental United States and Puerto Rico to discuss customers, rates, surcharges and bids for the sale of Puerto Rico freight services;
>
> (ii) agreeing during those meetings, conversations and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (iii) agreeing during those meetings, conversations, and communications to fix, stabilize, and maintain rates and surcharges charged to customers of Puerto Rico freight services;

3

>   (iv) agreeing during those meetings, conversations, and communications to rig bids submitted to government and commercial customers of Puerto Rico freight services;
>
>   (v) engaging in meetings conversations and communications for the purpose of monitoring and enforcing adherence to the agreed-upon rates and surcharges;
>
>   (vi) selling Puerto Rico freight services at collusive and noncompetitive rates and surcharges pursuant to the agreements reached;
>
>   (vii) accepting payment for Puerto Rico freight services at collusive and noncompetitive rates and surcharges; and
>
>   (viii) authorizing and consenting to the participation of subordinate employees in the conspiracy.

*Id.*, ¶ 77.

Peake's case is currently pending in the United States District Court for the District of Puerto Rico. Peake entered a plea of not guilty on December 15, 2011. *Id.* at ¶ 78.

**C.     Allegations of criminal conduct against Mr. Shapiro.**

9.     The Complaint alleges that (i) Shapiro was engaged in conduct similar to that of Peake and (ii) Shapiro was instrumental in the organization and conduct of the conspiracy that is the subject of this Complaint:

>   Shapiro instigated, participated in, and directed the conspiracy involving Puerto Rican Cabotage and Sea Star on behalf of Saltchuk and TOTE; he exercised control over Sea Star officers and directors, including Peter Baci; and he reached unlawful agreements with Horizon concerning the Puerto Rican Cabotage market.

*Id.*, ¶ 21.

Additionally, the Plaintiff alleges that Shapiro, like Peake, participated in various meetings in furtherance of the alleged conspiracy:

4

> On or about June 26, 2003, Serra and Shapiro met for approximately four hours at the Omni Hotel's restaurant near the Dallas-Fort Worth airport to address Horizon's complaints to Sea Star about market behavior in Puerto Rico. Shapiro proposed that the Puerto Rico market adopt what he called the "Alaska Model." In Alaska, Horizon and TOTE were the only competitors, and they shared the cabotage business equally. This resulted in stable market shares, loyal customers, and very little price competition.
>
> * * *
>
> Serra and Shapiro agreed that Horizon and Sea Star would adopt the Alaska model in Puerto Rico. Specifically, they agreed that Horizon and Sea Star would each be entitled to a 50% share of the southbound "blue water" vessel business on sailings from Jacksonville, Florida to Puerto Rico. Although the specifics of how the agreement would be addressed at a subsequent meeting as alleged herein, the concept discussed was to share pricing information, not compete on price, and adjust market share from time to time by ceding business to one another when necessary to maintain the 50-50 market division.
>
> * * *
>
> Upon returning from this meeting, Shapiro went to Baci's office at Sea Star and told Baci of the meeting with Serra and their agreement that Horizon and Sea Star would share the Puerto Rican Cabotage "blue water" business on a 50-50 basis so that Baci could begin to carry out the agreement, which he did.
>
> *Id.*, ¶¶ 117-119.

10. The Complaint also alleges that Shapiro, like Peake, was one of the main constituents in the conspiracy that is the subject of the Complaint:

> [Peter Baci's] Pre-Sentencing Memorandum stated that Leonard Shapiro 'was someone of massive authority' who threatened and directed the termination of employment of others at Sea Star; that Baci was ordered to implement the illegal agreement reached between Shapiro and Serra; and that Baci did, in fact, implement this agreement in coordination with Horizon's Gill.
>
> *Id, ¶ 51.*

5

D.  **Mr. Shapiro is the subject of a pending criminal investigation and cannot plead or otherwise participate in the instant action without undermining his 5th Amendment rights.**

11.  Mr. Shapiro is an identified target of a pending criminal investigation, which arises from the same factual scenario as the Complaint. Accordingly, Mr. Shapiro requests that this Court stay all proceedings as they pertain to him until the conclusion of the referenced criminal investigation proceedings and/or the expiration of all applicable Statutes of Limitations relating to the above allegations for which Mr. Shapiro is a criminal target (in approximately April 2013).

12.  As discussed in more detail below, a stay of all proceedings against Mr. Shapiro is warranted at this juncture, as the civil complaint in this case alleges matters that are also the exact subject of grand jury inquiry. The submission of pleadings and responses to civil discovery would prejudice the right of Mr. Shapiro to be free from such participation while the target of the grand jury inquiry. Specifically, discovery requests, whether by deposition, interrogatories or admissions, or other means, will obviously seek to elicit from Mr. Shapiro evidence, if any, that he allegedly engaged in the very same illegal activity that is the subject of grand jury inquiry and, potentially, the subject of a federal indictment. Further, this civil proceeding, if not deferred in its totality as to Mr. Shapiro, would undermine Mr. Shapiro's Fifth Amendment privilege against self-incrimination, expand rights of discovery beyond the limits of Fed. R. Crim. P. 16, and expose the basis of the defense to the prosecution in advance of any criminal trial. On the other hand, a delay of this civil proceeding as it pertains to Mr. Shapiro only will not seriously jeopardize the public interest or materially prejudice the Plaintiff.

### Memorandum of Law

Courts have discretion in deciding whether to grant a motion to stay. *Landis v. North American Co.*, 299 U.S. 248, 254, 7 S. Ct. 161, 81 L. Ed. 153 (1936). The power to stay a proceeding is within the court's control. *See id.* The parties and issues do not need to be the same for the court to grant a stay in one case to accommodate another case. *See id.* Federal courts have used the balancing test set in *Landis* that weighs the hardship to the moving party against the prejudice to the opposing party. *See id.* at 255 (holding that a party requesting a stay must show hardship if there is even a fair possibility that a stay would damage the opposing party); *see also Williford v. Armstrong World Inds., Inc.* 715 F.2d 124, 127 (4th Cir. 1983).

In deciding whether a stay should be granted, Federal Courts, including those within the Fourth Circuit, have routinely considered the following factors: (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation balanced against prejudice to the civil plaintiff caused by the delay; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) constitutional considerations and the interests of third parties; and (v) the public interest. *See, e.g., Avalonbay Communities, Inc. v. San Jose Water Conservation Corp*, 2007 U.S. Dist. Lexis 63773, 2007 WL 2481291 (E.D.Va. 2007), aff'd 325 Fed. Appx. 217, 2009 WL 1336717 (4th Cir. 2009); *In re Mid-Atlantic Toyota Antitrust Litl*, 92 F.R.D. 358, 359 (D.C. Md. 1981); *Scheuerman v. The City of Huntsville, Alabama*, 373 F.Supp.2d 1251, 1258 (N.D. Ala. 2005); *Microfinancial, Inc. v. Premier Holidays Intern., Inc.*, 385 F.3d 72, 78 (1st Cir. 2004); *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36 (S.D.N.Y. 1993).

As will be demonstrated below, the sound exercise of discretion in this case compels the entry of an order granting a stay as to Mr. Shapiro's obligation to answer, respond or present a

defense in the instant action until the conclusion of the above-referenced criminal investigation/proceedings and/or the expiration of all applicable Statutes of Limitation relating to the above allegations for which Mr. Shapiro is a DOJ criminal target (in approximately April 2013).

### A.     The interests of Plaintiff in avoiding a stay in this case are minimal.

The only potential harm to Plaintiff from imposition of a stay as to Mr. Shapiro in this case would be the risk of loss of evidence through fading memory, or a delay in receiving any judgment. Often, and especially in this case, these "risks" are far more conceptual than real, particularly where the parallel criminal investigation and proceedings are so closely aligned with the civil case. As can be ascertained from Plaintiff's allegations, the very same issues on which Plaintiff will conduct discovery in this civil action are those for which the United States has been using the Department of Justice and/or the grand jury process to assemble evidence. In fact, the government's active gathering of evidence likely will directly benefit Plaintiff in its civil action. As stated in *Volmar Distributors, Inc. v. New York Post Co.*, 152 F.R.D. 36, 40 (S.D.N.Y. 1993), when granting a stay, "due to the overlapping issues in the criminal and civil trials, the criminal justice system will help safeguard the evidence." *Accord, Trustees of Plumbers and Pipefitters Nat. Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1140 (S.D.N.Y. 1995) (granting the requested stay, stating "the evidence gathered during the criminal prosecution can later be used in the civil action.").

To the extent Plaintiff expresses concern that a delay in receiving any judgment in this case would reduce what funds might be available from Defendants to satisfy that judgment, this Court should dismiss that proposition as speculative and unconvincing, as other district courts have routinely done. *See, e.g., Volmar Distributors, Inc.*, 152 F.R.D. at 41 n.6 ("Plaintiffs also

8

suggest that postponing discovery might jeopardize their ability to collect any judgment they might obtain against Defendants. We reject this speculative argument because even if Defendants' resources are 'scarce,' Plaintiffs have not demonstrated how forcing Defendants to litigate both the civil and criminal cases simultaneously would help Plaintiffs."); *Walsh Securities, Inc. v. Cristo Property Mangmnt., Ltd.*, 7 F.Supp.2d 523, 528 (D.N.J. 1998) ("Delays in civil cases are fairly common, however. Walsh has asserted no injury that is particularly unique. Walsh's financial losses are undoubtedly continuing, as with any plaintiff during the pendency of a lawsuit. However, Walsh is protected from monetary harm caused by the delay by its ability to obtain interest as part of its ultimate judgment.").

Mr. Shapiro has promptly brought this issue to the Court's attention in the interest of avoiding delay in consideration of this Motion. Under these circumstances, the actual risks of a reasonable stay are minimal at best. To the contrary, the requested stay could actually provide Plaintiff with a significant advantage. "When a defendant faces a criminal prosecution that is likely to accomplish as much, if not more than can be achieved through civil litigation, there is little reason to deplete his resources through payment of attorney's fees to defend or participate in civil litigation that, while important, is essentially duplicative." *In re Worldcom, Inc. Securities Litigation*, 2002 WL 31729501 *9 (S.D.N.Y. 2002). For instance, the various efficiencies discussed below (in relation to the "convenience of the court" factor) would significantly reduce the burden on Mr. Shapiro's resources as well as Plaintiff's.

### B. Denial of the requested stay would significantly impair Mr. Shapiro's ability to defend this case and the criminal proceedings.

As part of an analysis of this factor, courts generally consider the magnitude of two alternative harms posed to a defendant, depending on whether the Fifth Amendment privilege is asserted. On the one hand, if a defendant elects to assert the Fifth Amendment privilege, it

9

detrimentally impacts his civil case because it "greatly increase[s] the chance that [he will] be found liable in the civil case for substantial sums of money" as a result of the adverse inference that the jury likely will draw. *Brock v. Tolkow*, 109 F.R.D. 116, 120 (E.D.N.Y.1985). On the other hand, if a defendant does not assert the Fifth Amendment privilege, the criminal case may be significantly impaired because "denying a stay might … expand the rights of criminal discovery beyond the limits of Rule 16(b) of the Federal Rules of Criminal Procedure, expose the basis of the defense to the prosecution in advance of trial, or otherwise prejudice the [criminal] case." *Volmar Distributors, Inc.*, 152 F.R.D. at 39 (granting stay) (internal citations omitted).

In addition to these very real risks consistently identified by the courts, it is certainly possible that criminal prosecutors might try to take advantage of Mr. Shapiro's assertions of the Fifth Amendment privilege in the civil proceedings in order to impeach him in a criminal case. *See, e.g., Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (no due process violation in impeaching testifying defendant with prior silence). Conversely, any answer or partial defense on the merits by Mr. Shapiro in this civil action might be interpreted as a waiver of his Fifth Amendment protections. Further, because Mr. Shapiro's testimony could directly aid in the criminal investigation against him, his assertion of the Fifth Amendment privilege in this civil suit is not hypothetical or unsubstantiated. Since there is a pending government investigation which focuses upon Mr. Shapiro as an identified criminal target, this is precisely the time when protection of Mr. Shapiro's Fifth Amendment rights is of paramount importance.

It is clear that the Fifth Amendment privilege exists in both civil and criminal proceedings. The privilege protects an individual from being compelled to answer official questions put to him in any "process, civil or criminal, formal or informal," where the answers might incriminate him in criminal proceedings. *LaSalle Bank Lake View v. Seguban*, 54 F.3d

387, 389 (7th Cir. 1995). The Fifth Amendment privilege in civil litigation applies not only at trial, but also to the pleading stage and discovery stage, including with respect to document production. *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924, 927 (7th Cir. 1983) (citing *United States v. Kordel,* 397 U.S. 1 (1970) and *Ohio v. Reiner,* 532 U.S. 17 (2001) (stating that Fifth Amendment protection applies to *any* response that would provide a "link in the chain of evidence" needed to prosecute)). If a party reasonably apprehends a risk of self-incrimination, he may claim the privilege though no criminal charges are pending against him, even if the risk of prosecution is remote. *Wehling v. Columbia Broad. Sys.,* 608 F.2d 1084, 1087 n.5 (5th Cir. 1979).

Since Mr. Shapiro's testimony in the civil suit would most certainly aid in the criminal investigation against him, Shapiro's assertion of the Fifth Amendment privilege in this action is not hypothetical. Rather, the validity and potential consequences of Mr. Shapiro's assertion of a Fifth Amendment privilege in this civil suit are readily apparent, as the pending criminal investigation arises from the same allegations as the civil suit. Specifically, the allegations in the Complaint filed by Plaintiff are so similar to and intertwined with the criminal investigation that an affirmative paragraph by paragraph answer to almost any of the allegations would compel Mr. Shapiro to make judicial admissions or denials that could provide direct evidence or a link in the chain of evidence needed to prosecute him in a parallel criminal proceeding, severely prejudicing Mr. Shapiro. *See Bathalter,* 705 F.2d at 927 n.5. Additionally, if Mr. Shapiro does respond to any of the allegations in the Complaint, doing so could be construed as a waiver of his Fifth Amendment privilege. Therefore, in the absence of the requested stay of this civil suit, Mr. Shapiro is presented with an impossible "catch-22" situation.

It is certainly true that "a defendant has no constitutional right to a stay simply because a parallel criminal proceeding is in the works." *Microfinancial*, 385 F.3d at 78-79. However, the instant Motion is based on this Court's inherent power to further the interests of justice - the same consideration underlying every stay granted by the courts due to the existence of parallel proceedings. As stated in *Brock v. Tolkow*, "even if a defendant's dilemma does not violate the Fifth Amendment or due process, it certainly undercuts the protections of those provisions, and a Court can exercise its discretion to enable a defendant to avoid this unpalatable choice when to do so would not seriously hamper the public interest." 109 F.R.D. 116, 121-22 (E.D.N.Y.1985).

### C. A stay of the instant civil proceedings against Mr. Shapiro pending completion of the criminal investigation proceedings is convenient for the courts as it would significantly reduce the amount and scope of litigation.

Courts addressing this factor have identified a number of ways in which staying a civil case will vastly increase judicial efficiency. "[A]lthough a stay pending resolution of the criminal action may result in an immediate delay in the progress of the civil actions, it is likely that the resolution of the criminal action will, ultimately, further [a] Court's interest in the efficient disposition of the civil actions." *Parker v. Dawson*, 2007 WL 2462677 *6 (E.D.N.Y. 2007).

First, a stay can eliminate discovery disputes surrounding the Fifth Amendment privilege. *See Walsh Securities, Inc.*, 7 F.Supp.2d at 528-29. Second, "the availability of transcripts and other evidence from the criminal trial may eliminate altogether the need for certain depositions." *Volmar Distributors, Inc.*, 152 F.R.D. at 41 (S.D.N.Y. 1993). Third, the outcome of the criminal case may significantly narrow the issues in the civil case, or potentially eliminate nearly all disputes, through collateral estoppel or *res judicata*. *Parker*, 2007 WL 2462677 at *6. Accordingly, a stay may "effectively dispose of all common issues in a subsequent civil action."

*Id.* Lastly, awaiting results of the criminal case could encourage settlement in a civil matter. *Volmar Distributors, Inc.*, 152 F.R.D. at 42.

### D. The constitutional dilemma posed by the Fifth Amendment carries far heavier weight than any concerns with delay that Plaintiff or third parties may have in this Case.

As recognized by the district court in *Parker*, "a stay will result in inconvenience and delay to Plaintiff. But under settled authority the Fifth Amendment is the more important consideration." 2007 WL 2462677 at *5 (internal citations omitted); *see also Dienstag v. Bronsen*, 49 F.R.D. 327, 329 (S.D.N.Y. 1970) ("While this [stay] will undoubtedly cause inconvenience and delay to Plaintiff, protection of Defendants' constitutional rights against self-incrimination is the more important consideration.").[3]

### E. The public interest is best served by protecting constitutional rights.

"[T]he public's interest in an accused's ability to assert a Fifth Amendment privilege outweighs the public's interest in a civil litigant's expeditious resolution of its case." *Holden Roofing, Inc. v. All States Roofing, Inc.*, 2007 WL 1173634 *2 (S.D. Tex. 2007). Although it is undeniable that the public has a compelling interest in preserving the integrity of competitive markets, such interest should not be promoted at the expense of the Fifth Amendment. For instance, in *Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, one district court analyzed this public interest dilemma in the context of a plaintiff's antitrust case, stating:

---

[3] *See also Trustees of Plumbers and Pipefitters Nat. Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1140 (S.D.N.Y. 1995) ("Plaintiffs have a legitimate interest in the expeditious resolution of their case and their argument that they could face prejudice from a stay through loss of evidence is well-taken. These interests, however, are trumped by Defendants' interests in avoiding the quandary of choosing between waiving their Fifth Amendment rights or effectively forfeiting the civil case. This is particularly true where the subject matter of both cases overlaps to a significant degree and the Criminal Case is expected to be resolved by the end of this year."); *Brock*, 109 F.R.D. at 121-22 (footnote omitted) ("[A] Court can exercise its discretion to enable a defendant to avoid th[e] unpalatable choice [of choosing between self-incrimination and forfeiting a civil case] when to do so would not seriously hamper the public interest. While a stay ... may cause some inconvenience and delay to the [government], 'protection of defendant[s'] constitutional rights against self-incrimination is the more important consideration.'").

> [P]laintiffs point out that the existence of the private treble-damage remedy in antitrust law represents a congressional determination that such actions are necessary to enforce the public interest crystallized in the antitrust laws. The argument is clearly correct in its general thesis. But it is equally obvious that the public interest in the vigorous prosecution of private antitrust claims must be less acute where, as here, the United States has decided to devote a part of its prosecutorial resources to bringing a criminal action. ... [T]he decision to prosecute a criminal antitrust case does represent a conscious determination by those entrusted with prosecutorial discretion that the public interest will be served by such a proceeding. In those circumstances, there does not seem to be the same pressure to expedite the private treble-damage action at least pending the disposition of the criminal trial.

87 F.R.D. 53, 58 (E.D. Pa. 1980); *see also Volmar Distributors, Inc.,* 152 F.R.D. at 40; *Walsh Securities, Inc.,* 7 F.Supp.2d at 529 ("[A] stay in this case would benefit the public by allowing the Government to conduct a complete, unimpeded investigation into potential criminal activity.")

F.     **Conclusion**

WHEREFORE, for all the foregoing reasons, Defendant Leonard Shapiro respectfully requests that this Court grant a stay of all proceedings *as they pertain to Mr. Shapiro only* until the conclusion of the referenced criminal investigation/proceedings and/or the expiration of all applicable Statutes of Limitation relating to the allegations for which Mr. Shapiro remains a criminal target (in approximately April 2013).

ROBERTSON HOLLINGSWORTH & FLYNN

By:     s/*Theodore L. Manos*
THEODORE L. MANOS
Federal Court ID # 7023
177 Meeting St., Suite 300
Charleston, SC 29401
Ph 843-723-6470
Fax 843-853-9045
Email: tlm@roblaw.net
**Attorneys for Defendant Leonard Shapiro**